IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2006 SEP 12 A 10: 31

| | | |
|---|---|---|
| CHARLES KELSER, d/b/a | * | |
| RIVER REGION EVENTS | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No. 2:06-CV-818 |
| | * | |
| ALCAZAR SHRINERS, | * | Jury Trial Demanded |
| SHRINERS OF NORTH AMERICA, | * | |
| and LEE SIMS, | * | |
| Defendants. | * | |

## COMPLAINT

COMES NOW Plaintiff, by and through his attorney of record, and would show unto the Court as follows:

### JURISDICTION AND VENUE

1. Plaintiff files this Complaint and invokes the jurisdiction of this Court under and by virtue of 42 U.S.C. § 1981, 42 U.S.C. § 2000a, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, 28 U.S.C. § 2202, and the doctrine of supplemental jurisdiction to obtain declaratory relief and compensatory and punitive damages. Defendants violated Plaintiff's rights as guaranteed by the Constitution of the United States, by Federal law, and by the laws and Constitution of 1901 of the State of Alabama.

2. The violations of Plaintiffs' rights as alleged herein occurred in Montgomery County, Alabama, and were committed within the Northern Division of the Middle District of the State of Alabama.

1

## PARTIES

3. Plaintiff Charles Kelser (hereinafter, "Kelser") is over the age of 19 years, and is and at all times material hereto was a citizen of the United States and the State of Alabama, residing in Montgomery County, Alabama.

4. Defendant Alcazar Shriners (hereinafter, "Alcazar") is, to the best of Plaintiff's knowledge and belief, an eleemosynary entity doing business as the Alcazar Shrine Center, 555 East Blvd, Montgomery, Alabama, in the Northern Division of the Middle District of Alabama. Alcazar is being sued under 42 U.S.C. § 1981 for money damages, under 42 U.S.C. § 2000a for prospective injunctive relief and for breach of contract under Alabama state law for money damages.

5. Defendant Shriners of North America (hereinafter, "Shriners International") is, to the best of Plaintiff's knowledge and belief, an eleemosynary entity doing business as Shriners International, 2900 Rocky Point Drive, Tampa, Florida. Shriners International, the parent of Alcazar and the entity ultimately responsible for its policies and practices, is being sued under 42 U.S.C. § 1981 for money damages, under 42 U.S.C. § 2000a for prospective injunctive relief and for breach of contract under Alabama state law for money damages.

6. Defendant Lee Sims (hereinafter, "Sims") is, to the best of Plaintiff's knowledge and belief, over the age of 19 years and is and at all times material hereto was a citizen of the United States and the State of Alabama. Sims holds the Alcazar-bestowed title of "Potentate". Sims is being sued in his official capacity for prospective injunctive relief and in his individual capacity for money damages.

## NATURE OF PROCEEDINGS

7. This is a proceeding for a judgment declaring the relative rights, responsibilities and liabilities of the parties, each to the other, and for injunctive and declaratory relief and compensatory and punitive damages for Plaintiff's suffering as a consequence of the wrongs alleged herein.

## FACTS

8. Kelser expressly adopts as if fully set forth herein the allegations in the foregoing paragraphs.

9. Alcazar is a creature of Shriners International which owns and operates the Alcazar Shrine Center in Montgomery, Alabama. The property in question consists of a facility called the "Red Fez" and another called simply the "Auditorium", both sited on the same premises.

10. Alcazar holds the properties open to the public for rental for private and public purposes such as gun-and-knife shows, parties, balls, corporate events, and the like.

11. At all times material hereto, Alcazar did not hold a premises liquor license.

12. Kelser operates River Region Events, an event planning and coordination entity. It is a "one-stop shopping center" for social events, concerts, corporate meetings, and the like.

13. Kelser desired access to a facility at which he could stage his events on an ongoing basis.

14. On or about June 1, 2006, Kelser entered into a "Lease Agreement" with Alcazar by and through Buddy Hartin.

15. The Lease Agreement was for a period of nineteen (19) months, ending January 1, 2008,

but with an "option to renew."

16. The Lease Agreement covered "events sponsored by lessee (Kelser) at a cost agreed upon by both parties" and events sponsored by lessor (Alcazar) requiring liquor sales." In the case of events sponsored by Alcazar, Kelser was to provide a bar and pay Alcazar 10% of the profit on liquor sales.

17. Pursuant to that agreement, and with the knowledge and consent of Alcazar, Kelser applied for and obtained a liquor license through the Alcoholic Beverage Control Board and the City of Montgomery. This involved posting notice at the Shrine Center, arranging for inspections, providing public notice through local media, passing a background check, and appearing before the Montgomery City Council.

18. There were no objections to the granting of the liquor license, either from Alcazar or from any other person or entity.

19. Kelser applied for and obtained a food permit. This required passing a health inspection.

20. Kelser expended great time and large sums of money in obtaining insurance to cover any potential liquor-related liability.

21. The first two events scheduled under the contract were set for July 25, 2006 (Senior Non-Commissioned Officers Academy graduation ceremony), and August 1, 2006 (Montgomery Auburn football kick-off banquet), both of which were booked by Alcazar.

22. Kelser furnished a cash bar for both events without incident and remitted 10% of the profits to Alcazar.

23. Kelser had booked the facility for August 4, 2006, for a "Latino Night." He had also booked the facility for another "Latino Night" for August 25, 2006.

24. Having earlier paid a $500 deposit, Kelser met with Hartin on August 4th to give him a check for $2,000, the balance of what was to be due for rental of the Center for the night of August 4th. Hartin refused the check and demanded that the balance be paid in cash. Hartin also demanded to see a copy of Kelser's liquor liability insurance policy, which he did not ask to see for the first two events.

25. Kelser brought Hartin the $2,000 in cash and faxed him a copy of the insurance certificate.

26. The "Latino Night" event was to have started at 11:00 p.m., a fact well known to Hartin and Alcazar, because much of the target audience for that event was composed of persons who worked in the food service industry and at other employment which made their attendance at an earlier time impossible.

27. Earlier, Kelser had been informed that he could stay open until 2:00 am.

28. In fact, events at the Shrine Center frequently have run and do last past 12:00 midnight.

29. When Hartin met with Kelser, some six hours prior to the start of the event, Hartin told Kelser for the first time that the facility would be closed at midnight.

30. Because keeping the event open for a mere hour would not be economically viable, Kelser was forced to cancel that event.

31. Alcazar officials later cancelled the subsequent "Latino Night" scheduled for August 25th.

32. Hartin told Kelser that he could get a refund of his $500 deposit the following Monday, August 7th, from Sims.

33. When Kelser appeared to receive his refund, he was presented with what Sims later whimsically termed an "acknowledgment and receipt" for the money.

34. The document did, in fact, contain an acknowledgment and receipt for the $500, but a subsequent paragraph purported to release Alcazar and Shriners International from all contracts and agreements between Alcazar and Kelser, in effect cancelling the entire Lease Agreement.

35. Kelser refused to sign, telling Sims that he needed time to seek legal advice.

36. Three days later, on August 10th, Kelser telephoned Hartin to check on the availability of the Red Fez facility for a future event. Hartin told Kelser that he had been advised not to rent either venue to Kelser in the future.

37. On August 14th, Kelser was telephoned by Roman Hochhalter, the Alcazar "Recorder", and instructed that he should remove his beer coolers from the premises, despite the fact that he had been told he could leave the coolers there in anticipation of another event on August 18th.

38. On August 16th, Sims wrote Kelser a letter saying, in relevant part, "[s]ince you have not contacted me as you indicated I will consider any and all contracts and or agreements between Alcazar Shriners ... terminated five (5) business days from receipt of this notification."

39. Also on August 16th, Kelser met with Chris Miles, who had booked the facility for another Latino party, "Latin la Noche", on August 18th. Kelser was to have provided the alcoholic beverages for that party. Miles advised Kelser that Sims had told him that Kelser was no longer allowed to sell alcohol at the Shrine Center and that Alcazar "didn't want to have anything to do" with Kelser. Miles then advised Kelser that Sims said he had cancelled the August 18th event because Alcazar did not want any Latinos in the

facility.

40. Upon information and belief, Miles complained to WSFA-TV about the cancellation, whereupon a news reporter contacted Sims. According to the reporter, Sims confirmed that he "didn't want the Latino community."

41. In addition to the foregoing, the defendants, by and through their agents, have demanded that Kelser surrender his liquor license; they have also attempted to have the Montgomery County Health Department revoke Kelser's food permit.

42. Kelser has or would have certain rights under the contract he has with the defendants; those rights give him the right to contract with Latino, or Hispanic, persons.

43. At all times material hereto, Kelser has been ready and willing to perform under the contract he had with Alcazar and, by extension, with Shriners International.

44. If he is permitted to do so, by Order of this Court or otherwise, Kelser has every intention of continuing to perform under the contract.

45. Sims, Alcazar, and Shriners International have committed a breach of the contract extant as between Alcazar and Kelser.

46. The defendants, with racially discriminatory intent, have interfered with Kelser's right to make and/or enforce contracts with Latino, or Hispanic, persons.

47. The said interference has been real and concrete, absolutely prohibiting Kelser's ability to contract with Latino, or Hispanic, persons.

48. The said interference was on the basis of race.

49. Kelser has been damaged thereby.

50. Kelser has suffered a loss of income for the three events which have been cancelled as a

result of the interference of the defendants in the amount of approximately $73,000 (gross), or $43,045 (net). The prospective loss of income through the term of the lease agreement is an additional approximate $1,064,500 (gross), or $802,090 (net).

## CAUSES OF ACTION

51. As to each of the counts herein below set forth, Kelsers expressly adopt as if fully set forth herein the allegations of the foregoing paragraphs.

### COUNT I – VIOLATION OF 42 U.S.C. § 2000a

52. At all times material hereto, Kelser was a party to a contract with Alcazar and Shriners International.

53. That contract enabled Kelser to form and enforce contracts with Latino, or Hispanic, persons.

54. That contract also enabled Kelser to form and enforce contracts with Chris Miles, who would have, in turn, formed and enforced contracts with Latino, or Hispanic, persons.

55. The Alcazar Center is a place of public accommodation within the meaning of 42 U.S.C.§ 2000a.

56. The defendants breached their contract with Kelser and thereby interfered with his right to make and enforce contracts with Latino, or Hispanic, persons.

57. The breach was on account of the race of the persons with whom Kelser sought to form and enforce contracts.

58. At all times material hereto, Kelser was ready and willing to perform under his contract with the defendants and was ready and willing to enter into contracts with Latino, or

Hispanic, persons.

59. Were the Court to Order such, Kelser has every expectation of performing under his contract with the defendants and of entering into contracts with Latino, or Hispanic, persons.

60. Kelser has been damaged by the actions of the defendants.

61. Kelser is entitled to injunctive relief and to reasonable attorneys' fees and the costs of this action.

## COUNT II – RACE DISCRIMINATION UNDER 42 U.S.C. § 1981

62. Kelser has, at all times material hereto, sought to make and form contracts with members of a protected class, Latino or Hispanic.

63. The defendants interfered with Kelser's ability to make and form the said contracts because of race.

64. The defendants breached Kelser's contract with Alcazar and Shriners International because of race.

65. Kelser has been damaged thereby.

## COUNT THREE – BREACH OF CONTRACT

66. At all times material hereto, Kelser had a valid and binding written contract with Alcazar and Shriners International.

67. Alcazar and Shriners International breached the said contract.

68. Kelser has been damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, THE PREMISES CONSIDERED, Kelsers pray for relief as follows:

a) Enter a declaratory judgment that the policies and practices complained of herein are unlawful and violative of 42 U.S.C. § 1981 and 42 U.S.C. § 2000a;

b) As to claims cognizable under 42 U.S.C. § 1981, grant Kelser compensatory damages as against the defendants in the amount of $1,137,500.00 or, in the alternative, nominal damages;

c) As to claims cognizable under 42 U.S.C. § 1981, grant Kelser punitive damages as against the defendants in the amount of $3,412,500.00 or, in the alternative, nominal damages;

d) As to claims cognizable under 42 U.S.C. § 2000a, enjoin the defendants from interfering with the contract between Kelser and Alcazar and from interfering with Kelser's right and ability to contract with Latino, or Hispanic, persons, either directly or indirectly, and compel the defendants to perform fully under the existing contract;

e) Grant Kelser such other equitable relief as would effectuate the purpose of the statutes invoked;

f) Grant Kelser the cost of this action including reasonable attorneys' fees;

g) Grant such other, further and different relief as this Court may deem just and proper, including all equitable relief, the awarding of which is within the jurisdiction of the Court.

RESPECTFULLY SUBMITTED this ___11___ day of September, 2006.

Jay Lewis (ASB-2014-E66J)
J-Lewis@JayLewisLaw.com

Andy Nelms (ASB-E63K-6972)
andynelms@jaylewislaw.com
Attorneys for Charles Kelser
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, Alabama, 36103
334-263-7733 (voice)
334-263-7733 (fax)

**PLAINTIFF DEMANDS TRIAL BY JURY**